J-S66014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF P.E. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.G., NATURAL FATHER | No. 707 WDA 2017 |

Appeal from the Decree Entered April 11, 2017
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): 49 In Adoption 2016

BEFORE: BENDER, P.J.E., DUBOW, J., and PLATT, J.[*]

MEMORANDUM BY BENDER, P.J.E.:        **FILED DECEMBER 18, 2017**

J.G. ("Father") appeals from the decree entered April 11, 2017, in the Court of Common Pleas of Erie County, which involuntarily terminated Father's parental rights to his minor child, P.E. ("Child") (born in September of 2014), pursuant to sections 2511(a)(1), (a)(2), (a)(11), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1] After careful review of the record and applicable law, we affirm.

The orphans' court summarized the procedural history and relevant facts of this case in its Pa.R.A.P. 1925(a) opinion, as follows:

> [Child] was born [in] September [of] 2014 and adjudicated dependent on September 30, 2014. At the time of the adjudication, [Father's] paternity was not established. [Father] stipulated to being a Tier III Megan's Law offender and to

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The parental rights of Child's biological mother, E.E. ("Mother"), were also involuntarily terminated by separate decree on the same date. Mother is not a party to the instant appeal.

violating the conditions of his probation which forbid him from having direct and indirect contact with minor females. Confirmation of [Father's] paternity occurred shortly after the dispositional hearing in late October [of] 2014.

[Erie County Office of Children and Youth ("the Agency")] filed a ["]Motion for Aggravated Circumstances and to Suspend Visitation["] on November 3, 2014. The Agency's motion as to the finding of aggravated circumstances was granted, but [its] motion to suspend visitation was denied. The Agency's request to eliminate reunification as a goal was also denied. The Agency was then ordered to implement a service plan for [Father].

Several permanency review hearings were held. Ultimately, the goal of the dependency action was changed to adoption after the April 7 and 20, 2016 review hearings. The juvenile court's decision was based in large part on [Father's] lack of progress with services.

[Father] appealed the change of goal to the Superior Court. The Superior Court affirmed the juvenile court's ruling *in toto* by non-precedential memorandum opinion filed November 1, 2016, and docketed at 799 WDA 2016. Subsequently, Father filed a timely petition for allowance of appeal to the Supreme Court of Pennsylvania, docketed at 505 WAL 2016. The petition was denied February 6, 2017.

In the interim, the Agency filed a petition for involuntary termination of [Father's] parental rights on July 6, 2016. The Agency filed an amended petition on February 28, 2017, adding grounds for termination under 23 Pa.C.S.[] 2511(a)(11) as to [Father].

Orphans' Court Opinion ("OCO"), 7/10/17, at 1-2 (citations to record and unnecessary capitalization omitted).

A termination hearing was held on March 9 and 10, 2017. The lower court made the following findings of fact based on the evidence presented at the hearing:

[Father] was offered a variety of services through the Agency and associated providers. Father also participated in a psychological evaluation conducted by Dr. Peter von Korff. A

- 2 -

theme was readily apparent in all the Agency's witnesses: that [Father] minimized his own long-term mental health needs, failed to respond to services provided, and failed to demonstrate an ability to put [Child's] needs ahead of his own.

Tina Ferraro [("Ms. Ferraro")], the Director of Project First Steps, and Sally Huston [("Ms. Huston")], a case aide, both testified to [Father's] abysmal performance with services and inappropriate behavior during visits with [Child].

[Father] became involved with [Ms.] Ferraro's program in March [of] 2015[,] until he was unsuccessfully discharged in January [of] 2016. [Ms.] Ferraro recalled that during [his] first interactions with her, [Father] displayed a range of emotions from "zero to sixty" and tended to "stay at sixty". [Ms.] Ferraro noted this was an area [Father] needed to address in order to establish a healthy relationship with both the adults assisting him and his child.

[Ms.] Ferraro also worked with [Father] through the implementation of behavior modification techniques and the use of a Real Care Baby Simulator (the ["]doll["]). Despite [Father's] overall positive scores, [Ms.] Ferraro reported the first time [Father] used the doll, its readings indicated all of its clothes were removed immediately and that it had been shaken. When [Ms.] Ferraro collected the doll from [Father] after this occasion, [Father's] comments insinuated that he was "testing" the doll to see what data it could record and what data it could not.

When [Ms.] Ferraro observed [Father] during visitation with [Child], [she] noted [Father] appeared to reign in his escalated behavior, but was still difficult to control. Of particular concern to [Ms.] Ferraro was her impression [Father's] actions were "scripted or coming from an agenda." After correction, [Ms.] Ferraro described [Father] appeared to improve, and she became hopeful [he] was making progress towards independent parenting. Unfortunately, [Father] later told [Ms.] Ferraro he simply "learned to give people what they wanted to see." After a similar incident [Father] lamented, "I'm so excited—you can't hold this against me," and "I knew I should stop but I wanted to see what would happen." In this instance, [Father] was swinging [Child] around the room shortly after [Child] ate, which caused the child to vomit. After some time, it was clear to the workers [Father] could not appreciate how his behavior effected

[*sic*] [Child]. In their opinion, it was "all about [Father] and how [he] felt."

According to [Ms.] Huston, [Father] was also unable to appreciate [Child's] medical needs, which included an allergy to milk and severe eczema. [Father] attended medical appointments for [Child], but was unable to recall basic information about [Child's] condition or the name of [Child's] primary care physician. When [Ms.] Ferraro tried to address this concern with [Father], [he] reacted defensively, stating he "just doesn't do well when he's on the spot," and "doesn't like pop quizzes."

Though [Father] knew [Child] had an allergy to dairy, [Ms.] Huston testified [that he] insisted on bringing [Child] ice cream for his birthday. When providers told [Father] the dessert was not medically appropriate for [Child], [Father] attempted to justify his gift by saying "it was just a little pint of ice cream."

Over time, even [Father's] participation in random urinalysis became inconsistent, which caused him to miss visits with [Child]. [Father] missed at least two months of visits in total because the specimens he provided were dilute or he could not produce.

[Ms.] Ferraro tried to brainstorm ways of remedying this problem with [Father]. Instead of taking responsibility for his actions and making an earnest attempt to do better, [he] cavalierly blamed his failures on his "kidneys because they didn't filter beverages quickly enough." [Ms.] Ferraro suggested [Father] see a doctor to address this condition, but [he] never followed up with a physician.

On at least one occasion when [Father] submitted a sample for testing, he tested positive for alcohol. When confronted, instead of admitting to consuming alcohol, [Father] became argumentative. [He] swore he didn't drink, only later to admit he "had taken a calculated risk [to consume alcohol] and it didn't pay off."

[Father's] missed visits greatly influenced his developing relationship with [Child]. Both [Ms.] Ferraro and [Ms.] Huston testified [Child's] initial responses to [Father]—failure to reach for him, showing little to no excitement [Father] was in the room, and not caring whether [Father] was there—became [Child's] go-to behavior. [Father], in turn, became more

animated, anxious, and emotional around [Child], which pushed [Child] further away. It was apparent to both [Ms.] Huston] and [Ms.] Ferraro [that Child] shared little to no bond with [Father].

In sum, [Ms.] Ferraro and [Ms.] Huston felt they provided [Father] with endless opportunities to improve his parenting skills. Despite their efforts, [Father] resisted treatment and displayed the same negative behaviors over a prolonged period of time.

The ongoing caseworker's testimony confirmed many of [Ms.] Ferraro and [Ms.] Huston's observations about [Father's] behavior with [Child], lack of bond, and lack of progress with services. At least one caseworker testified she observed [the vomiting incident], and after being shown how to properly position [Child] in a supported position, [Father] would still allow [Child] to fall over and hit his head.

The testimony from Gaylene Abbott-Fay [("Ms. Abbott-Fay")], the permanency caseworker, revealed [Child] was placed in a pre-adoptive home, was no longer in need of Early Intervention services, and no longer had allergies. She stated [Child] was verbal, bonded to the adoptive family, the home met his needs, and it was in [Child's] best interest [Father's] parental rights be terminated.

Dr. von Korff's testimony addressed the effect of [Father's] psychological condition on his ability to parent and [Father's] lack of success with Agency programs. [Dr.] von Korff also discussed the bonding assessment he performed on [Father] and [C]hild. The court gave Dr. von Korff's testimony great weight.

At the outset, [Dr. von Korff] found [Father] was defensive and hostile towards Project First Step's findings. [Father] even went so far as saying "maybe there's no more progress because there's no more progress to be made" in reference to his abysmal performance with Project First Step. The doctor stated [Father] felt his problems were not related to his own issues, but instead were "circumstantial;" the result of "bad deals in life and were not his fault." Dr. von Korff did not agree. Instead, the doctor opined [Father's] problems were "longstanding" and that [Father] required long[-]term counseling to address deficiencies in his attachment orientation and personal and social adjustment. Dr. von Korff stated [Father] "was more self-involved and more self-gratifying than he was aware of his

child's needs and these issues needed to be remedied before [Father] could adequately and safely parent [Child].

Additional testimony addressed Dr. von Korff's observations of [Father] and [C]hild's interactions and the results of the bonding assessment he performed. Dr. von Korff observed [Father] could, on occasion, interpret his son's cues, but would often echo [Child's] distress, which caused [Child] to pull away from him. Dr. von Korff also observed that when [Father] left the room, [Child] didn't "skip a beat." Instead of crying out, [Child] invited the doctor to play. According to the doctor, this behavior is often seen in children with avoidant attachment because they develop a way to manage the absence of a parent, though they still feel psychological stress.

As a final point, the doctor opined giving [Father] additional time to address his deficiencies and try a different method of care would be "challenging and possibly even damaging" to the child because the child was at a time in his life when stability and attachment to a primary caregiver was paramount.

The credibility of [Father's] testimony was suspect given [his] inability to candidly answer questions, if at all, and take responsibility for his actions. When asked why he chose to consume alcohol even though he knew testing positive for alcohol would result in missing visits with his son, [Father] stated he made a terrible choice and recanted his prior statement that he made a "calculated risk" to drink. Despite [Father's] recantation, [Father] testified that in deciding whether to drink, he weighed the facts as he knew them: that he was already called in to provide a sample twice that week, had already appeared on a Sunday that month, and therefore[,] concluded the likelihood he would be called in that Sunday to produce was minimal. [Father] went on to state his choice to describe the incident as one in which he took a "calculated risk to drink" amounted to merely a poor choice in words, and nothing more, even though the thought process [Father] described amounted to just that.

[Father] used the excuse he made a "poor choice in words" several other times in his testimony to explain away any statement he previously made that reflected poorly on him. In all of these instances[, Father] tried to convince the court his words, as stated, did not reflect his true intention.

- 6 -

> [Father's] answers to questions about his poor performance with Project First Step, failure to complete Dr. von Korff's evaluations, and[] conversely[,] his completion of services with Parkside [P]sychological [Associates], showed [Father] only applied himself to things he chose to, when he wanted to, despite admitting knowledge of the effect his failure would have on his ability to see [Child].

*Id.* at 2-9 (citations to the record and footnote omitted).

On April 11, 2017, after reviewing the evidence presented at the termination hearing and the briefs submitted by the parties, the court entered its decree terminating Father's parental rights. Father timely filed a notice of appeal on May 11, 2017, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Father now raises the following issues for our review:

1. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it concluded that [Father] was unwilling to successfully parent [Child] and accept constructive criticism from service providers?

2. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it found [Father] had difficulty improving as a parent due to his lack of consistency and insight into his own mental health?

3. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it concluded that [Father] failed to comply with the service plan?

4. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it found [Father] was unable to appreciate [Child's] medical needs or put [Child's] needs ahead of his own?

5. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it determined [Father] would only do what he wanted to do when he wanted to do it?

6. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it found [Father] failed to implement basic parenting skills and was unable to interpret his son's cues?

7. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it concluded that [Father's] testimony was not credible?

8. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it concluded that [Father's] parental rights should be terminated because he is required to register as a sexual offender?

9. Did the [o]rphans' court commit an abuse of discretion and/or error of law when it concluded that that [*sic*] the termination of [Father's] parental rights was in [Child's] best interest in view of the evidence of record that [Child] and … [F]ather share a loving relationship and bond?

Father's Brief at 8-9.[2]

We review an appeal from the termination of parental rights under the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re: R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a

---

[2] Father essentially treats issues one through seven as one claim in his brief and asserts that the orphans' court committed an abuse of discretion and/or error of law by terminating his parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1) and (2). *See* Father's Brief at 35-45. Accordingly, we address these issues together herein.

different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, … 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, … 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, … 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re S.H.***, 879 A.2d 802, 806 (Pa. Super. 2005). We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003) (internal quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted).

This Court must agree with only one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decree pursuant to sections 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions

and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A

- 11 -

child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

Moreover, this Court has previously stated:

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* Where a parent does not "exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." *In re A.S.*, 11 A.3d 473, 481 (Pa. Super. 2010).

Instantly, Father asserts that he remedied the causes which led to the removal of Child, consistently worked towards the goals of his treatment plan, and successfully demonstrated a willingness and ability to perform parental duties for Child. Father's Brief at 35. Father also insists that he was "misjudged" and was not given "an opportunity to demonstrate his abilities as a father." *Id.* at 38. After careful review, we discern that the record clearly belies Father's claims.

As summarized by the orphans' court,

[t]he testimony elicited from the Agency workers and other service providers revealed numerous occasions in which [Father] was unable to accept criticism or appeared to progress, but later admitted to "giving the workers what they wanted to see." Other statements [Father] made to [Dr.] von Korff[,] musing

- 12 -

that no more progress was being made because there was no more progress to make[,] support the notion [Father] was unable or unwilling to accept constructive criticism. Dr. von Korff testified extensively about [Father's] mental health deficiencies and need for long-term counseling services before [Father] could even attempt to successfully parent [Child]. In failing to complete Project First Step and failing to abstain from the use of drugs and alcohol, [Father] did not comply with the service plan.

[Father's] own testimony showed he would comply with the service plan and complete[] services only when he wanted to…. Given the manipulative nature of [Father's] testimony, and repeated assertion any of the statements he made which gave the Agency pause were nothing more than a "poor choice of words," it was not error to find [Father's] testimony lacked credibility and reliability.

OCO at 14 (citations to record omitted). We deem the court's determinations to be well-supported by the record.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are met. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but the focus is on the child pursuant to section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa.

- 13 -

1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). With respect to the bond analysis pursuant to Section 2511(b), the Court explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *Id.* "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, … the result, all too often, is catastrophically maladjusted children." *Id.*

Here, the orphans' court concluded that it would be in Child's best interest for Father's parental rights to be terminated. The court emphasized Father's incapacity to parent Child and the lack of bond between Father and Child. To the contrary, Father argues that the court erred in terminating his parental rights, claiming that he shared a bond with Child and that during his visits with Child, they began to develop a father-son relationship. Father's Brief at 50-51. Father added, "I don't doubt my capacity to safely

raise my son in a loving, nurturing, supportive, warm home…. No one wants [the] best for [Child] more than I do." *Id.* at 52.

After careful review, we conclude that the record overwhelmingly supports the orphans' court's decision to terminate Father's parental rights pursuant to section 2511(b). In support of its determination, the court explained:

> [Father] draws attention to Dr. von Korff's indications reunification may be achievable, but ignores the impact reunification would have on [Child]. [Child] has never lived in [Father's] care. While services to [Father] were available, visits never progressed beyond two hours, weekly, due to [Father's] actions. [Father] has not seen [Child] since services were terminated in April, 2016.
>
> In assessing whether [Child] was bonded to [Father], Dr. von Korff stated when [Father] left the room, [Child] "did not skip a beat," and adapted quickly. Service providers stated during community visits with the child, the child would gravitate towards them instead of [Father].
>
> Dr. von Korff also opined [Child] was at a time in his life where permanency and stability was of utmost importance. Failure to terminate [Father's] parental rights would only leave [Child] in limbo, waiting for [Father] to address his long-term individual needs, with no assurance [he] would succeed. The testimony indicated that at present, [Child] is a happy, well-adjusted toddler, who is bonded to another child in the adoptive home as a sibling.

OCO at 12-13 (citations to record omitted).

The record reflects Lisa Langer ("Ms. Langer"), the ongoing caseworker employed by the Agency, agreed that Father's lack of progress with court-ordered services and his inability to remedy any of the conditions that led to Child's original placement, coupled with Child's young age and need for

permanency, the lack of bond between Father and Child, and the fact that Child never spent any time in Father's care, were all factors that pointed in favor of terminating Father's parental rights. N.T. Termination, 3/10/17, at 59.[3] Moreover, Ms. Langer was unable to identify any possible negative effect that terminating Father's parental rights may have on Child. *Id.* at 62.

Additionally, the termination of Father's parental rights under section 2511(b) is supported by Ms. Abbott-Fay's testimony. She reported that Child is thriving in the adoptive home and is developmentally on target. Child no longer needs early intervention services and his allergies have improved. *Id.* at 83-84. Ms. Abbott-Fay added that Child only knows the current foster family as "his family" and refers to the foster parents as "Mommy and Daddy." *Id.* at 85, 87. When asked if she believed there would be any detrimental effect on Child if Father's parental rights were terminated, Ms. Abbott-Fay replied, "Absolutely not." *Id.* at 87.

As there is competent evidence in the record that supports the orphans' court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Father, we conclude that the court did not abuse its discretion as to section 2511(b). *See S.P.*, 47 A.3d

---

[3] The transcripts of the termination hearing indicate that the proceedings occurred on May 9 and 10, 2017; however, the actual dates the hearing occurred are March 9 and 10, 2017. The correct dates are used in the citations herein.

at 826-27. Accordingly, we affirm the decree terminating Father's parental rights to Child.

Decree affirmed.
Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/2017